IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

NICHOLE WAGONER

        Plaintiff,

        v.                             Civil Action No. 1:07-CV-133

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.


**REPORT AND RECOMMENDATION**
**SOCIAL SECURITY**

**I. Introduction**

A.    <u>Background</u>

      Plaintiff, Nichole Wagoner, (Claimant), filed her Complaint on September 27, 2007,

seeking Judicial review pursuant to 42 U.S.C. §§ 405(g) of an adverse decision by Defendant,

Commissioner of Social Security, (Commissioner).[1]  Commissioner filed his Answer on

December 7, 2007.[2]  Claimant filed her Motion for Summary Judgment on March 31, 2008.[3]

Commissioner filed his Motion for Summary Judgment on May 30, 2008.[4]

B.    <u>The Pleadings</u>

      1.    <u>Memorandum in Support of Plaintiff's Motion for Summary Judgment</u>.

      2.    <u>Defendant's Brief in Support of His Motion for Summary Judgment</u>.

---

[1] Docket No. 1.

[2] Docket No. 8.

[3] Docket No. 14.

[4] Docket No. 17.

C.     Recommendation

I recommend that:

1.     Claimant's Motion for Summary Judgment be **DENIED** and the case
**REMANDED** because although the ALJ's decision appears supported by substantial evidence,
the ALJ failed to demonstrate his consideration of 1) a portion of Ms. Wilson's August 2006
report, and 2) Claimant's limited ability to maintain a regular workday or workweek such that
remand is necessary.

2.     Commissioner's Motion for Summary Judgment be **DENIED** for the same
reasons set forth above.

## II.  Facts

A.     Procedural History

Claimant filed an application for Disability Insurance Benefits and Supplemental
Security Income on March 18, 2005, alleging disability since December 18, 2004 due to bipolar
disorder.  Claimant's application was denied initially on July 14, 2005, and upon reconsideration
on January 27, 2006.  Claimant requested a hearing before an ALJ and received a hearing on
December 6, 2006.  On February 22, 2007, the ALJ issued a decision adverse to Claimant.
Claimant requested review by the Appeals Council but was denied.  Claimant filed this action,
which proceeded as set forth above.

B.     Personal History

Claimant was 26 years old on the date of the December 6, 2006 hearing before the ALJ.
Claimant completed high school and has prior work experience as a line worker at a chicken
plant, deli worker, bartender, and painter.

C.     Medical History

The following medical history is relevant to the time period during which the ALJ

concluded that Claimant was not under a disability: December 18, 2004 through February 22,

2007:

**Elk Garden Rural Health Clinic, Progress Notes, 12/13/04 (Tr. 209)**

Mood disorder - Bipolar NOS.
Suicidal/homicidal ideation mids via PHG.  Started counseling at trauma recovery institute on
3/25/04. Missed her appointment this past week due to death of her grandmother.  States her
mood is down.  Has appointment tomorrow with Dr. Raines for meds.  Recommend continue
counseling and pharm therapy.

**Elk Garden Rural Health Clinic, Progress Notes, 12/13/05 (Tr. 211)**
Mood disorder - likely bipolar. Saw counselor for intake at Potomac Highlands Guild and has
appt with psychiatrist in the middle of this month.  Denies suicidal/homicidal ideation.

**Elk Garden Rural Health Clinic, Progress Notes, 12/13/05 (Tr. 213)**
Mood disorder - possibly bipolar. States she has a lot of danger.  Divorced about 3 months.  Lost
child at 7 mos gestation in 2001.  Watched her father die in tractor-trailer accident at age 13.
Sleep disrupted. Cannot go to sleep at night, tired all day.  States fluctuations between very good
mood and active and depressed mood and inactivity.  States impulse control problems and has
had financial problems as a result. Denies suicidal/homicidal ideation.  Advised needs
psych/counseling.  Will arrange at Potomac Highlands Guild per patient request.

**Tracy Cosner-Sheperd, M.S., West Virginia Disability Determination Service, Mental
Status Examination, 7/4/05 (Tr. 222)**
Social: She maintained good eye contact and gave appropriate responses, but they tended to be
somewhat short.  She was also rather subdued.
Speech: Speech was a bit monotone.
Orientation: Orientation was x3.
Mood: Mood was downcast.
Affect: Affect was somewhat flat.
Thought process: Thought process was within normal limits, as her stream of thought was
organized.
Thought Content: She reported having a fear of birds.
Perceptual: She stated. "My inner me" talks to her, and she said, "I don't need medication . . .
nothing wrong with . . my inner me is pretty much perfect."
Judgment: Judgment was within normal limits, based on her responses to several Comprehension
questions.
Suicidal/Homicidal ideations: She stated that she has had some suicidal ideations but with no

immediate plan or intent. She denied any immediate threat of homicide, as well.

Objective Findings: Some depressive symptoms, with downcast mood, flat affect, and monotone speech; history of unstable mood; history of trauma, with nightmares, hypervigilance, and so forth; history of substance abuse/dependence; some mental health treatment; limited education, with history of academic difficulties; limited vocational skills or work experience; family dysfunction; impaired memory; impaired concentration: and limited social interaction.

Diagnoses

        Axis I: Alcohol dependence, early full remission.

               Posttraumatic stress disorder, chronic.

               Mood disorder, NOS (provisional)

        Axis II: Personality disorder, NOS

        Axis III: Polycystic ovarian syndrome (per patient report)

Diagnostic Rationale: A diagnosis of alcohol dependence was given since the claimant did state that she used to drink every day at least four to six beers a day. She said that she has not drank, however, since December of 2004. She noted the use of marijuana once in a while, as well, but did not indicate it regularly. She reported a history of abuse as a child and also indicated that she was traumatized by an accident in which her father was killed. She did report experiencing nightmares and feelings of guilt. She has difficulty sleeping, racing thoughts, hypervigilance, and uneasiness around others. She also reported experiencing panic attacks and described them as occurring out of her sleep. Such symptoms appear to be consistent with posttraumatic stress disorder. She stated that she has been suicidal and has had thoughts of homicide when upset. She indicated being hospitalized after a suicide attempt a few years ago, and said that she has begun receiving treatment in the last few months. She indicated that she has been diagnosed as having bipolar disorder, and so, given her mood disturbance, a notation of mood disorder, NOS was given on a provisional basis, as some symptoms could be explained by the posttraumatic stress disorder. A diagnosis of depressive disorder should be ruled out versus bipolar disorder. Lastly, a diagnosis of personality disorder, NOS was noted on Axis II, given her family dysfunction, history of mental health treatment, and legal problems. Given her educational history, a diagnosis of sub-average intelligence should also be ruled out.

Prognosis: Fair

Social Functioning:

        During the evaluation: Mildly deficient. She maintained good eye contact and gave appropriate responses, but they tended to be somewhat short. She was also rather subdued, with downcast mood, somewhat flat affect, and monotone speech.

        Reported social activities: She does not attend church or church activities. She does not belong to any clubs or organizations. She does not eat out. She does not date. She said that she does not have contact with friends. She sees her aunts and uncles when they come to the house. She does not socialize with neighbors, and she tends to keep to herself.

Concentration: Moderately deficient based on her ability to calculate serial threes.

Persistence: Within normal limits based on observation.

Pace: Mild solely based on observation.

Immediate memory: Within normal limits based on four out of four words recalled immediately.

Recent memory: Moderately deficient based on two out of four words recalled after 30 minutes.

Remote memory: Within normal limits based on her ability to provide personal information.

Capability: If granted benefits, the claimant is competent to manage her finances.

**Joseph Kuzniar, Ed.D., DDS Physician, Mental RFC Assessment, 7/11/05 (Tr. 228)**

Mental RFC Assessment

Understanding and Memory:

Ability to remember locations and work-like procedure: not significantly limited

Ability to understand and remember very short and simple instructions: no evidence of limitation in this category

Ability to understand and remember detailed instructions: moderately limited

Sustained concentration and persistence

Ability to carry out very short and simple instructions: no evidence of limitation in this category

Ability to carry out detailed instructions: moderately limited

Ability to maintain attention and concentration for extended periods: moderately limited

Ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances: moderately limited

Ability to sustain an ordinary routine without special supervision: no evidence of limitation in this category

Ability to work in coordination with or proximity to others without being distracted by them: moderately limited

Ability to make simple work-related decisions: no evidence of limitation in this category

Ability to complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistence pace without an unreasonable number and length of rest periods: moderately limited.

Social Interaction

Ability to interact appropriately with the general public: not significantly limited

Ability to ask simple questions or request assistance: no evidence of limitation in this category

Ability to accept instructions and respond appropriately to criticism from supervisors: moderately limited

Ability to get along with coworkers and peers without distracting them or exhibiting behavioral extremes: moderately limited

Ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness: not significantly limited

Adaptation

Ability to respond appropriately to changes in the work setting: moderately limited

Ability to be aware of normal hazards and to take appropriate precautions: not significantly limited

Ability to travel in unfamiliar places or use public transportation: not significantly limited

Ability to set realistic goals or make plans independently of others: not significantly limited

Functional Capacity Assessment: The RFC ratings show the capacity to understand, remember, and carry out 1-3 step simple routine instructions within a very low social interaction demand work setting. The capacity for adaptation is as rated in Section I-D.

**Joseph Kuzniar, Ed.D, DDS Physician, 7/11/05 (Tr. 232)**

Psychiatric Review Technique

Medical Dispositions: RFC Assessment Necessary

Category(ies) upon which the medical disposition is based: 12.04 Affective Disorders; 12.06 Anxiety-related disorders; 12.08 Personality Disorders.

12.04 Affective Disorders: Disturbance of mood, accompanied by a full or partial manic or depressive syndrome, as evidenced by at least one of the following: bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes).

12.06 Anxiety-Related Disorders: A medically determinable impairment is present that does not precisely satisfy the diagnostic criteria above: PTSD

12.08 Personality Disorder: A medically determinable impairment is present that does not precisely satisfy the diagnostic criteria above: Personality disorder.

Functional Limitation for Listings 12.04, 12.06, 12.08

> Restriction of Activities of Daily Living: Moderate
> Difficulties in Maintaining Social Functioning: Moderate
> Difficulties in Maintaining Concentration, Persistence or Pace: Moderate
> Episodes of Decompensation, each of extended duration: None

"C" Criteria of Listings 12.04 and 12.06: Evidence does not establish the presence of the "C" Criteria

Notes: The allegation is supported by the MER and the Function Report. Limitations were generally supported by the CE results indicates full credibility.


**John Yarbrough, M.D., Chestnut Ridge Hospital, 7/19/05 (Tr. 247)**

Diagnosis:

> Axis I: bipolar affective disorder; posttraumatic stress disorder; nicotine dependence; marijuana abuse; history of cocaine abuse.
> Axis II: None
> Axis III: Hypertension. History of galactorhea secondary to antipsychotic (Risperdal).
> Axis IV: Medication noncompliance. Social stressors. Chronic mental illness.
> Axis V: GAF admission 20, discharge 60.

Hospital Course: The patient is a 25-year old caucasian female admitted to Chestnut Ridge Hospital Psychiatric Intensive Care Unite with suicidal ideations and homicidal ideations . . .


**Carlos Manzano-Jordan, M.D., Chestnut Ridge Hospital, 7/20/05 (Tr. 248)**

Mental Status Examination: The patient is cooperative. She is alert and oriented to time, place, situation, and person. There is no tremor. Speech normal. Attention fair. Eye contact fair. Memory 1 out of 3 at five minutes. Mood depressed. Affect broad. Thought process is goal directed. Thought content with positive ideas of reference. The patient thinks that people are following her or watching her. The patient has positive auditory hallucinations, although not at this time. She denies suicidal ideation although she came with reported suicidal ideation with a plan to overdose. She denies homicidal ideation although she said that she is not sure if she is going to hurt somebody but does not have a plan. Fund of knowledge is average. Conceptual ability abstract. Insight and judgment poor.

Impression:

Axis I: Rule out bipolar disorder; nicotine dependence; alcohol dependence in partial remission; cocaine abuse.
Axis II: deferred
Axis III: deferred
Axis IV: social stressors.
Axis V: GAF 20 to 30.

<u>Plan</u>: 1) Suicide precautions, restricted to unit. 2) Admit to the psychiatric intensive care unit at Chestnut Ridge Hospital . . .

**Chestnut Ridge Hospital, 7/20/05 (Tr. 256)**
<u>Problem List</u>: "Homicidal suicidal I get pissed off all the time."  Mood swings.  Irritable, sad depressed and angry.

**Potomac Highlands Guild, 8/29/05 (Tr. 259)**
<u>History</u>: Good control of anger. Sleep Ok. . . . Looking for a job.
Calm affect, mood neutral. Speech normal. Nonpsychotic.

**Potomac Highlands Guild, Social Assessment UPDATE, 8/2/05 (Tr. 261)**
<u>Impression</u>: Nichole was recently discharged from Chestnut Ridge Hospital where she was admitted on 7/21/05 for indicating that she was thinking about hurting herself.  She currently appears stable.

**Norma Sosa, M.S., Potomac Highlands Guild, 6/20/05 (Tr. 269)**
Referred by Dr. Raines.
Clinical Impressions:
1) Appearance - normal.
2) Nourishment - development, overweight.
3) Behavior - the client remained calm in the session, was talkative, good eye contact.
4) Patient's ability to relate to examiner - the client was cooperative, engage in the conversation; she elaborated her answers.
5) Other - the client was oriented, memory/concentration problems were not present, poor judgment, poor insight.
<u>Diagnosis</u>
Axis I: Bipolar D/O Mixed; GAD
Axis II: deferred
Axis III: please see chart
Axis IV: primary support group, financial, occupation
Axis V: 50

**Potomac Highlands Guild, 6/14/05 (Tr. 272)**
No panic spells. A lot of irritability and anger. Having vivid violent dreams.
Calm affect/mood angry and dysphoric. Speech coherent. Some insight. Not suicidal.

**Potomac Highlands Guild, 5/24/05 (Tr. 273)**

Had panic attack. Calm affect/mood mildly anxious and dysphoric. Speech coherent. Nonpsychotic.

**Dr. Raines, Potomac Highlands Guild, 4/5/05 (Tr. 276)**
"DHHR: Ms. Wagoner has 1) bipolar disorder, mixed, 2) panic disorder, 3) PTSD. She is disabled and has applied for SSDI. She is needful and deserving of Medicaid to obtain treatment.

**Julie Keesler, Potomac Highlands Guild, 11/18/05 (Tr. 279**)
Suicide Assessment: Suicidal thoughts-yes. Frequency of thoughts - occasionally. Intensity of thoughts - not very strong.
Previous history of suicidal behavior? Yes. Overdosed on pills. In intensive care for 1 week. Went to Sacred Heart Hospital. 5 years ago.
Danger to others
       History of hurting others? No
       Thoughts of hurting others? Yes
       Frequency of thoughts: frequently
       Thoughts of hurting ex husband.
Mental Status Examination
       Thought disturbance: tangential.
       Too little sleep.
       Mood: rapid swings
       Impaired judgment
       Impaired impulse control
       Recent memory impairment
       Orientation: Person, place, time.
       Level of consciousness: alert
       Appearance: appropriately dressed
       Speech: Normal
       Behavior: Calm
       Eye contact: Good
       Conduct: Cooperative
       Psychomotor: Calm
       Affect: Downcast
       Mood: Depressed
Initial Diagnostic Impression
       Axis I: Bipolar DO-depressed.
       Axis III: low blood sugar, back pain, daily headaches.
       Axis IV: primary support group, finances.
       Axis V: GAF 50.

**Norma Sosa, MSSC, Mental Impairment Questionnaire (RFC and Listings) 12/20/05 (Tr. 289)**
Frequency and length of contact: 2 app 6/20/05 and 7/19/05.
DSM-IV Mental Evaluation

Axis I: Bipolar D/O mixed
Axis III: hypoglycemia.
Axis IV: primary support group, financial.
Axis V: Current GAF 50. Highest GAF past year: 55.

<u>Patient's signs and symptoms</u>: poor memory; social withdrawn or isolation; mood disturbance;; emotional lability; feelings of guilt of worthlessness; difficulty thinking or concentrating; sleep disturbance; social withdrawal or isolation; decreased energy; hostility or irritability.

<u>Is your patient a malingerer</u>: No.

<u>Are you patient's impairments reasonably consistent with the symptoms and functional limitations described in this evaluation</u>? Yes.

<u>Has your patient's impairment lasted or can it be expected to last at least twelve months</u>? Yes.

<u>Mental Abilities to do Unskilled Work</u>

Remember work-like procedures: Fair

Understand and remember very short and simple instructions: Fair

Carry out very short and simple instructions: Fair

Maintain attention for two hour segments: Poor

Maintain regular attendance and be punctual within customary, usually, strict, tolerances: Poor

Sustain an ordinary routine without special supervision: Fair

Work in coordination with or proximity to others without being unduly distracted: Poor

Make simple work-related decisions: Poor

Complete a normal workday and workweek without interruptions from psychologically based symptoms: Poor

Perform at a consistent pace without an unreasonable number and length of rest periods: Poor

Ask simple questions or request assistance: Fair

Accept instructions and respond appropriately to criticism from supervisors: Poor

Get along with co-workers or peers without unduly distracting them or exhibiting behavior extremes: Poor

Respond appropriately to changes in a routine work setting: Poor

Deal with normal work stress: Poor

Be aware of normal hazards and take appropriate precautions: Fair

<u>Mental Abilities and Aptitudes Needed to do Semiskilled and Skilled Work</u>

Understand and remember detailed instructions: Poor

Carry out detailed instructions: Poor

Set realistic goals or make plans independently of others: Poor

Deal with stress of semiskilled and skilled work: Poor

<u>Mental Abilities and Aptitudes Needed to do Particular Types of Jobs</u>

Interact appropriately with the general public: Poor

Maintain socially appropriate behavior: Fair

Adhere to basic standards of neatness and cleanliness: Fair

Travel to unfamiliar place: Poor

Use public transportation: Fair

<u>Indicate to what degree the following functional limitations exist as a result of your patient's</u>

mental impairments:

      Restrictions of activities of daily living: Moderate

      Difficulties in maintaining social functioning: \_\_\_

      Deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner (in work settings or elsewhere): Marked

      Episodes of decompensation: Four or more

<u>Is your patient currently abusing alcohol or illegal drugs</u>? No

**<u>Dr. David Allen, Ph.D., DDS Physician, Mental RFC Assessment, 1/17/06 (Tr. 294)</u>**

<u>Understanding and Memory</u>:

Ability to remember locations and work-like procedure: not significantly limited

Ability to understand and remember very short and simple instructions: not significantly limited

Ability to understand and remember detailed instructions: moderately limited

<u>Sustained concentration and persistence</u>

Ability to carry out very short and simple instructions: not significantly limited

Ability to carry out detailed instructions: moderately limited

Ability to maintain attention and concentration for extended periods: moderately limited

Ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances: no evidence of limitation in this category

Ability to sustain an ordinary routine without special supervision: not significantly limited

Ability to work in coordination with or proximity to others without being distracted by them: moderately limited

Ability to make simple work-related decisions: not significantly limited

Ability to complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistence pace without an unreasonable number and length of rest periods: moderately limited.

<u>Social Interaction</u>

Ability to interact appropriately with the general public: not significantly limited

Ability to ask simple questions or request assistance: not significantly limited

Ability to accept instructions and respond appropriately to criticism from supervisors: moderately limited

Ability to get along with coworkers and peers without distracting them or exhibiting behavioral extremes: moderately limited

Ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness: not significantly limited

<u>Adaptation</u>

Ability to respond appropriately to changes in the work setting: moderately limited

Ability to be aware of normal hazards and to take appropriate precautions: not significantly limited

Ability to travel in unfamiliar places or use public transportation: no evidence of limitation in this category.

Ability to set realistic goals or make plans independently of others: no evidence of limitation in this category.

<u>Functional Capacity Assessment</u>: MER supports the case for severe mental impairments (bipolar,

PTSD, Personality Disorder) that do not meet or equal the listings (See PRTF). However, these impairments do carry moderate impairment of certain work related functions as described on the present form. Despite these moderate functional limitations, in my opinion the claimant retains mental/emotional capacity to complete work that has low social demand and that involves no more than 3 step procedures/instructions.

**Dr. David Allen, Ph.D., DDS Physician, Psychiatric Review Technique, 1/17/06 (Tr. 298)**
Medical Dispositions: RFC Assessment necessary
Category(ies) upon which the medical disposition is based: 12.04 Affective Disorders; 12.06 Anxiety-related disorders; 12.08 Personality Disorders.
12.04 Affective Disorders: Disturbance of mood, accompanied by a full or partial manic or depressive syndrome, as evidenced by at least one of the following: bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes).
12.06 Anxiety-Related Disorders: A medically determinable impairment is present that does not precisely satisfy the diagnostic criteria above: PTSD
12.08 Personality Disorder: A medically determinable impairment is present that does not precisely satisfy the diagnostic criteria above: Personality disorder, NOS.
Functional Limitation for Listings 12.04, 12.06, 12.08
        Restriction of Activities of Daily Living: Moderate
        Difficulties in Maintaining Social Functioning: Moderate
        Difficulties in Maintaining Concentration, Persistence or Pace: Moderate
        Episodes of Decompensation, each of extended duration: None
"C" Criteria of the Listings 12.04 and 12.06: Evidence does not establish the presence of the "C" Criteria
Notes: AFRQ statements supported by MER. Claimant credible - RFC indicated. New evidence shows recent brief crisis hospitalization/med adjustment with Potomac Highland Guild. Follow-up notes show "good control" of anger, which is evidence the "C" Criteria are not met.

**Dr. Sharon Wilson, BS, LCSW, Mental Impairment Questionnaire (RFC and Listings), 2/23/06 (Tr. 312)**
Frequency and length of contact: Nicole was admitted on 1-18-05 and she is seen for dx at least every 3 months.
DSM-IV Mental Evaluation
        Axis I: Bipolar D/O mixed
        Axis II: Personality Disorder.
        Axis III: hypoglycemia.
        Axis IV: 01-02-06
        Axis V: Current GAF 50. Highest GAF past year: 50.
Patient's signs and symptoms: poor memory; appetite disturbance with weight change; social withdrawn or isolation; personality change; mood disturbance; emotional lability; paranoia of inappropriate suspiciousness; feelings of guilt of worthlessness; difficulty thinking or concentrating; sleep disturbance; personality change; social withdrawal or isolation; decreased

energy; intrusive recollections of a traumatic experience; persistent irrational fears; generalized persistent anxiety; somatization unexplained by organic disturbance; hostility or irritability.

Clinical findings including results of mental status examination that demonstrate the severity of your patient's mental impairment and symptoms: On the most recent evaluation completed Nichole scored 28/43.  This is a decline in her __ from 30/43,

Is your patient a malingerer: No.

Are you patient's impairments reasonably consistent with the symptoms and functional limitations described in this evaluation? Yes.

Prognosis: Nicole has dramatic mood swings and continued irritability. Could limit her ability to maintain employment.

Has your patient's impairment lasted or can it be expected to last at least twelve months? Yes.

On average, how often do you anticipate that your patient's impairments or treatment would cause your patient to be absent from work? More than three time a month.

Mental Abilities to do Unskilled Work

      Remember work-like procedures: Poor

      Understand and remember very short and simple instructions: Fair

      Carry out very short and simple instructions: Poor

      Maintain attention for two hour segments: Poor

      Maintain regular attendance and be punctual within customary, usually, strict, tolerances: Poor

      Sustain an ordinary routine without special supervision: Poor

      Work in coordination with or proximity to others without being unduly distracted: Poor

      Make simple work-related decisions: Poor

      Complete a normal workday and workweek without interruptions from psychologically based symptoms: Poor

      Perform at a consistent pace without an unreasonable number and length of rest periods: Poor

      Ask simple questions or request assistance: Good

      Accept instructions and respond appropriately to criticism from supervisors: Fair

      Get along with co-workers or peers without unduly distracting them or exhibiting behavior extremes: Poor

      Respond appropriately to changes in a routine work setting: Poor

      Deal with normal work stress: Poor

      Be aware of normal hazards and take appropriate precautions: Fair

Mental Abilities and Aptitudes Needed to do Semiskilled and Skilled Work

      Understand and remember detailed instructions: Poor

      Carry out detailed instructions: Poor

      Set realistic goals or make plans independently of others: Poor

      Deal with stress of semiskilled and skilled work: Poor

Mental Abilities and Aptitudes Needed to do Particular Types of Jobs

      Interact appropriately with the general public: Fair

      Maintain socially appropriate behavior: Poor

      Adhere to basic standards of neatness and cleanliness: Poor

      Travel to unfamiliar place: Poor

Use public transportation: Good

Indicate to what degree the following functional limitations exist as a result of your patient's mental impairments:

Restrictions of activities of daily living: Extreme

Difficulties in maintaining social functioning: Extreme

Deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner (in work settings or elsewhere): Extreme

Episodes of decompensation: Three

Is your patient currently abusing alcohol or illegal drugs? Unknown.

If yes, would the patient's symptoms go away if he or she stopped abusing alcohol and/or drugs? No.


**Dr. Sharon Wilson, BS, LCSW, Mental Impairment Questionnaire (RFC and Listings), 8/29/06 (Tr. 317)**

Frequency and length of contact: Nicole was admitted on 1-18-05. She sees the physician and the case manager ___.

DSM-IV Mental Evaluation

Axis I: Bipolar D/O mixed

Axis II: Personality Disorder.

Axis III: hypoglycemia, chronic pain.

Axis IV: 01-02-06

Axis V: Current GAF 50. Highest GAF past year: 50.

Clinical findings including results of mental status examination that demonstrate the severity of your patient's mental impairment and symptoms: Nicole scored 25/43 on the latest Mental Status exam with deficits in orientation, recent memory, calculations, proverbs (abstract thinking) and concentration.

Prognosis: Currently stable with some medication side effects.

Patient's signs and symptoms: appetite disturbance with weight change; decreased energy; feelings of guilty or worthlessness; impairment and impulse control; generalized persistent anxiety; mood disturbance; difficulty thinking or concentrating; recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress; persistent disturbances of mood or affect; paranoid thinking or inappropriate suspiciousness; emotional withdrawal or isolation; bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes); intense and unstable interpersonal relationships and impulsive and damaging behavior; disorientation to time and place; hallucination or delusions; easy distractibility; sleep disturbance; recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week.

Mental Abilities and Aptitudes Needed to do Unskilled Work

Remember work-like procedures: Unable to meet competitive standards.

Understand and remember very short and simple instructions: Unable to meet competitive standards.

Carry out very short and simple instructions: Unable to meet competitive standards.

Maintain attention for two hour segments: Unable to meet competitive standards.

Maintain regular attendance and be punctual within customary, usually, strict, tolerances: Unable to meet competitive standards.

Sustain an ordinary routine without special supervision: Unable to meet competitive standards.

Work in coordination with or proximity to others without being unduly distracted: Unable to meet competitive standards.

Make simple work-related decisions: Unable to meet competitive standards.

Complete a normal workday and workweek without interruptions from psychologically based symptoms: Unable to meet competitive standards.

Perform at a consistent pace without an unreasonable number and length of rest periods: Unable to meet competitive standards.

Ask simple questions or request assistance: Unable to meet competitive standards.

Accept instructions and respond appropriately to criticism from supervisors: Unable to meet competitive standards.

Get along with co-workers or peers without unduly distracting them or exhibiting behavior extremes: Unable to meet competitive standards.

Respond appropriately to changes in a routine work setting: Unable to meet competitive standards.

Deal with normal work stress: Unable to meet competitive standards.

Be aware of normal hazards and take appropriate precautions: Unable to meet competitive standards.

<u>Mental Abilities and Aptitudes Needed to do Semiskilled and Skilled Work</u>

Understand and remember detailed instructions: Unable to meet competitive standards.

Carry out detailed instructions: Unable to meet competitive standards.

Set realistic goals or make plans independently of others: Unable to meet competitive standards.

Deal with stress of semiskilled and skilled work: Unable to meet competitive standards.

<u>Mental Abilities and Aptitudes Needed to do Particular Types of Jobs</u>

Interact appropriately with the general public: Unable to meet competitive standards.

Maintain socially appropriate behavior: Unable to meet competitive standards.

Adhere to basic standards of neatness and cleanliness: Unable to meet competitive standards.

Travel to unfamiliar place: Unable to meet competitive standards.

Use public transportation: Seriously limited, but not precluded.

<u>Explain limitations falling in the three most limited categories (identified by bold type) and include the medical/clinical findings that support this assessment</u>: Nichole has a very short attention span, is easily distracted and experiences difficulty maintaining, concentration. She also experiences a great deal of difficulty controlling her anger.

<u>Does your patient have a low IQ or reduced intellectual functioning</u>? Unknown. She has not had a psychological.

<u>Indicate to what degree the following functional limitations exist as a result of your patient's mental impairments</u>:

Restrictions of activities of daily living: None

Difficulties in maintaining social functioning: Moderate
Deficiencies of concentration, persistence, or pace: Moderate
Episodes of decompensation within 12 month period, each of at least two weeks duration: None

Please indicate if any of the following apply to your patients:

A. Medically documented history of a chronic organic mental, schizophrenic, or affective disorder of at least 2 years duration that has caused more than a minimal limitation of ability to do any basic work activity, with symptoms or signs currently attenuated by medication or psychological support, and one of the following: 1) A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; 2) current history of 1 or more years inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement.

B. An anxiety related disorder and complete inability to function independently outside the area of one's home.

On the average, how often do you anticipate that your patient's impairments or treatment would cause your patient to be absent from work? More than four days per month.

Has your patient's impairment lasted or can it be expected to last at least twelve months: Yes. Is your patient a malingerer? No.

Are you patient's symptoms reasonably consistent with the symptoms and functional limitations described in this evaluation? Yes.

Describe additional reasons not covered above why your patient would have difficulty working at a regular job on a sustained basis? Nichole if pressured in any work environment could possibly become extremely aggressive.

Can your patient manage benefits in his or her own best interest? No.


**Potomac Highlands Guild, Inc., 8/29/06 (Tr. 324)**

Consumer's statement of current problem: Nichole indicated that she is increasingly having difficulty with controlling her anger and her medication does not appear to be effective. She indicated that she "blacked out" from her anger and when she came to . . . she was almost ready to stab a relative.

Other concerns or stressors: Nichole remains concerned about her inability to control her anger.

Interviewer's Impressions: Nichole is a 26 year old female who is diagnosed with Bipolar Disorder, with psychotic features, Anxiety Disorder NOS, and Personality Disorder NOS. She continues to reside with her grandparents who she has termed "two old crabs." Her medications include . . . . Nichole has indicated that her medications are not effective. She is due to see her physician next week. Continue physician services, medication management, clinical assessments and social work services.


**Potomac Highlands Guild, Inc., 1/31/06 (Tr. 331)**

Calm affect/mood decreased. Nonpsychotic. Speech coherent. No motor slowing. Nonpsychotic. No SI.

Assessment: Bipolar disorder mixed with psychotic ___. Anxiety disorders (Panic/PTSD __).

Plan: Discussed hospitalization if not improved.

**Potomac Highlands Guild, Inc., 1/17/06 (Tr. 332)**
Calm affect/mood neutral. Speech normal. No thought disorders.
Assessment: Improved.

**Potomac Highlands Guild, Inc., 12/19/05 (Tr. 333)**
Calm. Affect/mood angry and decreased. Speech coherent. Nonpsychotic. Not suicidal.
Assessment: Same.

**Julie Keesler, Potomac Highlands Guild, Inc., 1/18/05 (Tr. 338)**
Social History (NEW)
Interviewer's Impressions: Nichole was open and honest during our meeting.  Her mood appeared depressed. Her speech was normal and her eye contact was good. She has affective social skills. She feels she would benefit from therapy and medications.

D.      Testimonial Evidence

        Testimony was taken at the December 6, 2006 hearing.  The following portions of the

testimony are relevant to the disposition of the case.

[EXAMINATION OF CLAIMANT BY ALJ]   (Tr. 335)

        Q       Okay.  What is your date of birth?

        A       5/17/1980.

        Q       How old are you today?

        A       Twenty-six.

        Q       How tall are you?

        A       Five three.

        Q       And I need to know for disability purposes your weight?

        A       Two seventy.  I've gained a lot of weight from my medication.

        Q       Do you consider that normal, no?

        A       My doctor says it's normal.

Q       The weight gain?

A       Yeah.

Q       From the meds?  Okay.  And you're married, single?

A       I'm divorced.

Q       Do you have any other children besides the one you - -

A       No.

Q       Now, you told me that you were pregnant, but you lost the baby?

A       Yeah, I was seven months pregnant and I lost the baby.

Q       All right.   No other children?

A       No.

Q       Okay.  Driver's license?

A       No.

Q       You never got one?

A       Yes.

Q       What happened to it, DUI?

A       No.  I fleed the scene of an accident.

Q       Were you arrested?

A       No.

Q       How did they - -

A       I was fined.

Q       And you never got your license back?

A       I haven't paid the fine.

Q       How much is it?

A       Twelve hundred.

Q       And let's see.  Is this also an SSI case?  How far did you go in school?

A       Twelve years.

Q       Graduated?

A       Yes, sir.

Q       Are you able to read?

A       Yes.

Q       Can you write?

A       Yes.

Q       Can you count money and make change?

A       Somewhat, yes.

Q       Is alcohol a problem for you?

A       It used to be.

Q       How long ago has it been?

A       Four years.

Q       You're not doing it now?

A       No.

Q       Was there also marijuana?

A       It used to be.

Q       And going through some of your medical records I have some questions about

your conditions, but first I want to try to cover your work history, so we'll hold the impairments

or conditions until we figure out what you've done. When you made application you said you became disabled December the 18th of '04. What is that date? What is the importance of that date?

A        The importance of that day? That day?

ATTY        Why you put that down?

BY ADMINISTRATIVE LAW JUDGE:

Q        Why - - did you do that or did Social Security put that day down when you went to make application? You said that's when you became disabled. I'm trying to find out what is significant about that day.

A        That's when I went to the doctor. That's when I started going to the doctor and Social Security - -

*                *                *

Q        Difficulty being around other people and crowds?

A        Yes.

Q        What's the number for you that makes you uncomfortable? How many people would it have to be before you - -

A        I'm uncomfortable now.

Q        Okay. I' m counting four; is that correct? You have to answer.

A        Yes.

Q        Okay. Strangers, can you deal with stranger?

A        No.

BY ADMINISTRATIVE LAW JUDGE:

Q      Do you get any help from the state?

A      I have a West Virginia medical card and I receive food stamps.

Q      Any help from family or friends?

A      I live with my grandparents.  They help me as much as they can, but my grandma she is 69 and my grandfather is 70 and they can't help me very much.

Q      Sleep, how many hours do you average a night?

A      A day?

Q      Night.  When you go to bed.

A      At night?

Q      How long do you sleep?

A      Probably ten, eleven hours a night.

Q      So you're not up and down, you don't toss and turn, you sleep straight through?

A      My pills knock me out.

Q      Which one do you take for sleep?

A      The Seroquel.

Q      What about your personal needs?  Can you shower or bathe, dress yourself, wash your hair, things like that without help or assistance?

A      If I'm on one of my low, then I actually have to drag myself to the shower or I'm laying in bed for a week, and I'm just not doing anything.  My grandma is telling me, you got to get up, you got to get a shower, you got to do this, you got to do that.  So, it's hard to do them

kind of things if I'm on a low.

Q    Well, when you're able to do it do you have to have help?

A    I don't have to have help, no.

Q    Do you help your grandmother cook?

A    I cook some.

Q    You do?

A    Yeah.

Q    Do you eat out a lot?

A    Do what, sir?

Q    Eat out a lot?

A    No.

Q    So on a typical day when are you out of bed?  What time do you - -

A    10:00 or eleven o'clock.

Q    And how many bad days do you have in a week?

A    Oh, my.

Q    On seven days how many would be good and how many would be bad?

A    Maybe four days out of a week I got a good day.  I got to - - maybe four days I got as bad days and maybe two days is a good day.

Q    On a good day when you're up at 10:00 or 11:00 how will you spend your time during the day?  Will you help your grandmother do housework and chores?

A    Most of the time I might watch TV or vacuum the floor or something like that, but most of the time she does it on her own.

Q      Okay. Do you help her at all with laundry? Do you do your own laundry?

A      No.

Q      Who does it?

A      She does.

Q      You don't have any chores at all for living there?

A      No.

Q      Shopping? You don't help out, you don't go to the store with her?

A      No.

Q      Don't help her buy groceries or anything?

A      No.

Q      Never?

A      Once in a while maybe.

Q      Well, that's what I'm asking. How often would you go?

A      Maybe once a month.

Q      By yourself?

A      No.

Q      With her?

A      Yeah.

Q      Now we're in contact with crowds, we're over four, how do you handle that?

A      It's really, really hard. That's why I don't like to go.

Q      Do you have any hobbies or activities?

A      I like to color.

Q        Anything else?

A        No.

Q        Music?

A        Yeah, I like listening to music.

Q        Do you sing?

A        No.

Q        Do you play any instruments?

A        No.

Q        Okay.  Do you belong to any clubs or organizations, churches or lodges?

A        No.

Q        What have you given up?

A        I used to hunt, I used to like to fish.

Q        You went fishing just recently and you have a license, don't you?

A        Huh?

Q        You have a current license to fish, don't you?

A        Yeah, I got my fishing license last year.

Q        And so when you go do you stand on a bank or do you get in a boat, how do you

do it?

A        I stand on a bank.

Q        Can you do that?

A        Where - - see, my grandparents own river lot.

Q        Okay.

A      And there's a bank down at the thing and you can sit on the bank and fish, but - -

Q      Can you do that?

A      No.

Q      How often do you fish?

A      I went fishing once through the summer.  My fishing license was a birthday present.

Q      Okay.  Did you have one last year?

A      What, my fishing license?  Yeah, that's what I'm talking about.

Q      Well, this is '06.  You don't have one for '06?

A      No.

Q      You didn't fish this summer?

A      Yeah, that's what I'm talking about.

Q      All right.

A      I had one for the summer.

Q      Okay.  But it's usually good for 12 months, isn't it, West Virginia?

A      Yeah, I still have them.

Q      Okay.

A      But I ain't fishing.

Q      How about for '05?  Did you have one for '05, last year?

A      No.

Q      No.

A      I don't think I did.

Q       When's the last time you went hunting?

A       Oh, my God.  It's been since I was a kid.

*               *               *

[EXAMINATION OF CLAIMANT BY ATTORNEY] (Tr. 376)

A       I used to like to go out and dance.  I was a member of the American Legion.  It's been like five or six years ago, the Auxiliary Club.  I mean, I left my membership die and - -

Q       Anything else you've given up?

A       No.

Q       Your grandparents' home where you live, is it more than one story?

A       No, it's just one.

Q       One floor?

A       Yeah.

Q       Your bedroom is on the main level?

A       Yeah.

Q       Any basement?

A       No.

Q       No pets?

A       My grandma has a dog.

Q       Do you take care of it?

A       No, she does.

*               *               *

Q       - - kick in?  Okay.  Now, you were also talking a little bit about you have up

periods and down periods.  Can you tell us how long these cycles go and what - - Counsel - - I mean the Judge asked you within a one-week period of time.  How long do these cycles last and can you describe them for us so we have some understanding as to how it affects you and your sleep and getting up and getting around and doing things?

A    See, my mood is like a roller coaster.  I mean, my down periods it seems like alls I want to do is just - - I mean, I'm depressed, I cry all the time, I don't want to do nothing, I don't want to be around nobody, I just want to - - it seems like I want to go to bed and die, and that could last maybe three days, four days a week, a week and a half, two weeks.  And then if I'm on a up period it's like on the best drug in the world, and it can - -

Q    In other words you feel you can do more things then?

A    Oh, yeah.  I feel like Superman.  I mean, I want to, you know, jump for joy.  I mean, it's just like wow, you know, what happened.

Q    Tell me about these problems getting along - - there seems to be a running through this.  We talked about the alcohol before, we talked about the marijuana previously. There seems to be a stream running through this that you have problems getting along with people or getting along?  Can you give us some example of that or give us some kind of insight as to what it's like from your perspective?

A    Well, my - - Norma Sosa, my person I talk to, I didn't want to discuss a certain subject with her.  It was about my son that died, and I slammed my hands down on her desk and got a little bit violent and I got sent to Chestnut Ridge.  I was almost homicidal.

Q    Explain to me what that means when you talk about homicidal and I mean, we understand what it means from a technical, but tell us what was going on with you at that period

of time.

A       I wanted to kill her.

Q       And what's happened since then?  I mean, do you ever have situations like that

anymore - -

A       Yes.

Q       - - where you get those thoughts?

A       Yes.  Where I beat up stuff.

Q       What do you mean you beat up stuff?

A       Hit that walls, cuss off people.

Q       When was the last time you've had trouble with things like this?

A       Last week.

Q       Oh, well, how about with individuals, with people?  Can you give us an

illustration of getting involved with somebody or what happened?

A       Over the summer me and my cousin got in a fight and I was going to stab him.  I

mean, in my mind I know it's wrong, but I can't control it.

Q       What is it you mean you can't control?  You can't control is it you feel an impulse

to do that?

A       Yeah, I just cannot control it.  It's like something - - it's like a different me.  It's

like a whole new me.  Something comes over me and I just cannot control it.  I mean, I know it's

wrong.  I mean, once I settle down and, you know, start to thinking about it, see my mind - - I

don't know.   It's weird.

*          *          *

Q      Mr. Ganoe, you've been present throughout the entire hearing; is that correct?

A      Yes.

Q      Have you had any prior contact with Ms. Wagoner?

A      No, Your Honor.

Q      Have you and I discussed her case?

A      No.

Q      Is there any additional information you would need from the Claimant before you could determine her past relevant work and classify the exertion and skill level?

A      No, Your Honor.

Q      Would you classify her work if you could identify - - that you've identified based on the rules and regulations that your experience would be substantial gainful work activity?

A      Work as a line worker at the chicken plant, working as a poultry eviscerator [phonetic], exertional level is light, skill level is unskilled; she worked as a deli worker, exertional level is light, skill level is unskilled; she did a few months as a bartender, exertional level was as described as light, skill level is semiskilled; and a few months as a painter, exertional level is medium and skill level is unskilled, Your Honor.

Q      Well, if we start with the fact that this individual Claimant is between the ages of 24 and 26, she is a younger individual, she has a high school education, and according to my understanding of your testimony all of her work was unskilled except one job was semiskilled. Which one was that?

A      Bartender.

Q      Okay.  And all at the light level except painter at medium?

A      Yes.

Q      As we indicated there's no functional capacity assessment physically, so let's assume the medium exertional level of work activity for a hypothetical individual.  That would mean that such an individual could stand and walk six out of eight hours with normal breaks, sit six out of eight with normal breaks, pushing and pulling with the upper and lower extremities would be unlimited with the weight limits of medium, posturally such an individual should never climb any ladders, ropes or scaffolds, environmentally avoid the hazards of moving machinery and unprotected heights.  Now, looking at her past work would all of the work be available to her with that hypothetical if the individual had the same jobs as the Claimant?

A      I think all the work would be available except maybe the painter position, Your Honor.  I think maybe she may have to use ropes and scaffolds and ladders there.

Q      Now, if we dropped it to the light exertional level with the same non-exertional limitations as previously described, would the light work remain?

A      Working as the line worker in the chicken plant I think that would eliminate that one, Your Honor.

Q      The deli worker and bartender would remain?

A      Yes.

Q      Well, the mental conditions need to be considered for such an individual that the need to do just simple routine type work, avoiding complex or detailed activity, and by simple I mean one- and two-step type work; contact with coworkers and supervisors is only occasional; no work with the general public, more emphasis for her on working with things rather than

29

people, and of course according to the doctors a low-stress work setting, no fast-paced production work activity.   Now, if we add that to the light hypothetical that I previously gave you, again looking at the past work would the light jobs remain under those conditions?

A       No, they would not, Your Honor.

Q       Even the unskilled light would be eliminated?

A       Yes, it would be, Your Honor, because we're looking at contact with the public.

Q       All right.  Now, based upon that hypothetical would such an individual be able to work in the national or regional economy, the region to be defined by you based upon availability of jobs that you could identify?

A       The region I'll use is all of West Virginia, western Maryland, western Pennsylvania.  Under the light exertional level laundry worker, 88,000 nationally, 1,300 regionally; a garment sorter, 178,000 nationally, 1,500 regionally.  Those are a sampling, Your Honor.

Q       The record contains again no functional assessment so let's just try sedentary, drop it to sedentary with the non-exertional and mental limits.  Would there be examples of sedentary work, lift ten pounds occasionally and five pounds frequently?

A       Under the sedentary level, Your Honor, an addresser stuffer, 240,000 nationally, 2,000 regionally; a general sorter, 25,000 nationally, 900 regionally.  Again those are a sampling, Your Honor.

Q       All right.  Now, in the record I believe that Counsel submitted an assessment by Nichole - - Sharon Wilson.  Ms. Wilson talked about seeing the Claimant every three months, and this is dated February of '06, with the majority of the abilities listed as poor, including

understanding, remember and carrying out - - I'm sorry, carrying out simple instructions poor, but she can understand and remember them. Pretty much all the categories in mental abilities to do unskilled work, to do semiskilled work was all eliminated to do particular jobs, poor ability to maintain a socially appropriate behavior, a poor ability to maintain standards of neatness and cleanliness, poor ability to travel in unfamiliar places. All of the limitations functionally and activities of daily of living, social and concentration, persistence and pace are classified as extreme, but yet the Claimant is sitting here in this Hearing Room today, so my understanding of extreme would be just mentally instituted, you know, in a mental institution, but yet assuming those limitations and their credibility would an individual be able to work?

A    In my opinion they would not be able to, Your Honor.

Q    Now, there's another one in the record by Sharon Wilson. It appears twice, one at 15F, one at - - and refilled again at 17F. Ms. Wilson lists all abilities to do unskilled work as unable to meet standards, to do semiskilled and skilled work unable to meet standards, and she's a little kinder. She lists the activities of daily living as none or mild, and only moderate in social functioning and moderate in concentration, persistence and pace; however, with the inability to do simple routine work would basically all jobs be eliminated in your opinion?

A    In my opinion they would be, Your Honor.

Q    If the Claimant's testimony is considered credible and supported by her medical evidence of record so as to eliminate even sedentary work, and as we indicated no simple routine work because of marked inability to maintain attention and concentration, would there by any work that you could identify?

A    None that I could identify, Your Honor.

*          *          *

E.       Lifestyle Evidence

The following evidence concerning the Claimant's lifestyle was obtained at the hearing and through medical records.  The information is included in the report to demonstrate how the Claimant's alleged impairments affect her daily life.

•       Lives with grandparents.  (Tr. 82)

•       5'5" tall, 250 pounds.  (Tr. 60)

•       Sometimes does dishes and laundry.  (Tr. 82, 226)

•       Takes care of a cat.  (Tr. 83)

•       Able to clothe and groom herself.  (Tr. 83).

•       No longer has a license to drive.  (Tr. 85)

•       Shops for food once per month.  (Tr. 85)

•       Able to count change.  (Tr. 85)

•       Reads and watches television.  (Tr. 86)

•       Spends time with grandma and sometimes plays cards, three times per week.  (Tr. 86)

•       Can walk one block before needing to rest for 2-3 minutes.  (Tr. 87)

•       Does not follow written or spoken instructions well: "I mess up sometimes," and "I get confused."  (Tr. 87)

•       Does not get along well with authority figures.  (Tr. 88)

•       Thinks about suicide.  (Tr. 88)

•       Does not handle well changes in routine.  (Tr. 88)

- Lays on couch and watches TV all day.  (Tr. 108)

- Leaves house to go to doctor's office or to see her counselor.  (Tr. 113)

- 2 puffs of marijuana within three months.  (Tr. 264)

- Divorced.  (Tr. 355)

- Lost her driver's license because she fled the scene of an accident.  (Tr. 356)

- Helps grandmother cook.  (Tr. 370)

- Likes to color.  (Tr. 371)

- Obtained fishing license; went fishing once in Summer 2006.  (Tr. 372)

### III.  The Motions for Summary Judgment

A.    Contentions of the Parties

Claimant argues the ALJ erred in two respects: first, he erred in finding the "C" criteria of Listings 12.04, 12.06, and 12.08 were not satisfied; second, he failed to include all of Claimant's non-exertional limitations in the hypothetical to the VE.  Commissioner argues the ALJ properly concluded Claimant did not meet the "C" criteria of Listings 12.04, 12.06, and 12.08, and included in the hypothetical to the VE all Claimant's non-exertional limitations supported by the objective medical evidence.

B.    The Standards.

1.    Summary Judgment.  Summary judgment is appropriate if  "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact.  Celotex Corp. v. Catrett, 477 U.S.

317, 322-23 (1986).  All inferences must be viewed in the light most favorable to the party opposing the motion.  <u>Matsushita Elec.  Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).  However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." <u>Anderson v.  Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986).

     2.    <u>Judicial Review</u>.  Only a final determination of the Commissioner may receive judicial review.  <u>See</u>, 42 U.S.C. §405(g), (h); <u>Adams v. Heckler</u>, 799 F.2d 131,133 (4th Cir. 1986).

     3.    <u>Social Security - Medically Determinable Impairment - Burden</u>. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy.  42 U.S.C. § 423(d)(1), (d)(2)(A); <u>Heckler v. Campbell</u>, 461 U.S. 458, 460 (1983).

     4.    <u>Social Security - Medically Determinable Impairment</u>.  The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); <u>Throckmorton v. U.S. Dep't of Health and Human Servs.</u>, 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

     5.    <u>Disability Prior to Expiration of Insured Status- Burden</u>.  In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status.  <u>Highland v. Apfel</u>, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(I), 423(c); <u>Stephens v. Shalala</u>, 46 F.3d 37, 39 (8th Cir.1995)).

6.      Social Security - Standard of Review.  It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Secretary.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.      Social Security - Scope of Review - Weight Given to Relevant Evidence.  The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry."  Milburn Colliery Co. v. Hicks, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence.  Gordon v. Schweiker, 725 F.2d 231, 235-36 (4th Cir. 1984).

8.      Social Security - Substantial Evidence - Defined.  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9.      Social Security - Sequential Analysis.  To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform her past work; and 5) whether the claimant is capable of performing any work in the national economy.  Once claimant satisfies Steps One and Two, she will

automatically be found disabled if she suffers from a listed impairment. If the claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job. Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

C.    Discussion

1.    Whether the ALJ Erred In Analyzing the Listings.

Claimant argues the ALJ erred in finding her mental impairments did not meet or equal the "C" Criteria of Listings 12.04, 12.06, and 12.08.[5] Specifically, she alleges the ALJ, in arriving at his finding, failed to assign the proper weight to Ms. Wilson's report dated August 2006, and Ms. Sosa's report dated December 2005. Commissioner contends the ALJ properly concluded Claimant's impairments did not meet the "C" criteria of Listings 12.04, 12.06, and 12.08.

At step three of the sequential analysis, the ALJ must determine whether any of the claimant's impairments meet or equal the criteria listed in 20. C.F.R. § 404, subp. P, app. 1. If a claimant's impairment meets or equals the criteria of a Listing in Appendix 1, that individual is determined to be disabled without the need for further review, because the impairments listed in Appendix 1 are so severe that they would "ordinarily prevent an individual from engaging in any gainful activity." 20 C.F.R. § 404, subp. P, app. 1. The claimant bears the burden of proving that their impairment meets all - not merely some - of the criteria in a specific Listing. Fleming

_____

[5] Listing 12.08 has only "A" and "B" criteria, and no "C" criteria. Accordingly, Claimants argument is interpreted as challenging the ALJ's finding she did not meet the "B" criteria of Listing 12.08.

v. Barnhart, 284 F. Supp. 2d 256, 269 (D. Md. 2003).

**Listing 12.04, Affective Disorders**, is characterized by "a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation." 20 C.F.R. § 404, subp. P, app. 1, Listing 12.04. Listing 12.04 is met when the criteria in both "A" and "B" are satisfied, or when the criteria in "C" is satisfied. Id. The "B" criteria are satisfied when at least two of the following are met: 1) Marked restriction of activities of daily living, 2) Marked difficulties in maintaining social functioning, 3) Marked difficulties in maintaining concentration, persistence, or pace, or, 4) Repeated episodes of decompensation, each of extended duration. Id. The "C" criteria require:

> "medically documented history of a chronic affective disorder of at least 2 year's duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: 1) Repeated episodes of decompensation, each of extended duration, or 2) A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or 3) Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement."

Id.

In the disorders falling under **Listing 12.06, Anxiety-Related Disorders**, "anxiety is either the predominant disturbance or it is experienced if the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders." Id., Listing 12.06. Listing 12.06 is met with the criteria in both "A" and "B" are satisfied, or when the criteria of both "A" and "C" are satisfied. Id. The "B" criteria are satisfied when at least two of the

following are met: 1) Marked restriction of activities of daily living, 2) Marked difficulties in maintaining social functioning, 3) Marked difficulties in maintaining concentration, persistence, or pace, or, 4) Repeated episodes of decompensation, each of extended duration.  Id.  The "C" criteria are satisfied by evidence the claimant's disorder "result[s] in complete inability to function independently outside the area of one's home."  Id.

Pursuant to **Listing 12.08, Personality Disorders**, a personality disorder "exists when personality traits are inflexible and maladaptive and cause either significant impairment in social or occupational functioning or subjective distress.  Characteristic features are typical of the individual's long-term functioning and are not limited to discrete episodes of illness."  Id., Listing 12.08.  Listing 12.08 is met with the criteria in both "A" and "B" are satisfied.  The "B" criteria are satisfied when at least two of the following are met: 1) Marked restriction of activities of daily living, 2) Marked difficulties in maintaining social functioning, 3) Marked difficulties in maintaining concentration, persistence, or pace, or, 4) Repeated episodes of decompensation, each of extended duration.  Id.

The ALJ in the present case concluded Claimant's mental impairments were not severe enough to meet or medically equal Listing 12.04, 12.6, or 12.08.  (Tr. 20).  Specifically, he found Claimant did not satisfy the "B" Criteria of any of the Listings because she had only moderate limitations in her activities of daily living; only moderate limitations in her ability to maintain social functioning, concentration, persistence or pace; and experienced no episodes of decompensation.  (Tr. 22).  The ALJ also found Claimant did not satisfy the "C" Criteria of the Listings.  In so finding, the ALJ relied primarily on Claimant's lifestyle evidence, his assessment of Claimant's credibility, and Ms. Wilson's report dated August 2006 wherein Ms. Wilson rated

Claimant has having only mild to moderate functional limitations. (Tr. 23, 317). The ALJ rejected Ms. Wilson's report dated February 2006 wherein Ms. Wilson rated Claimant as having extreme functional limitations. (Tr. 24, 312). He also rejected Ms. Sosa's reported dated December 2005 wherein Ms. Sosa rated Claimant has having "marked" deficiencies in concentration, persistence, and pace. (Tr. 24, 289).

The Court has reviewed the ALJ's decision, including his treatment of Ms. Wilson's and Ms. Sosa's reports. It finds the ALJ's ultimate conclusion regarding the "B" and "C" criteria of Listings 12.04, 12.06, and 12.08, and his treatment of Ms. Wilson's and Ms. Sosa's reports is supported by the following evidence. First, the record shows Claimant retains the ability to socialize with her aunts and uncle at her house (Tr. 222); play cards with her grandmother (Tr. 86); care for her cat (Tr. 83); go fishing; help her grandmother cook (Tr. 370); attend doctor's or counselor's appointments (Tr. 113); and color (Tr. 371). Second, two DDS physicians - one in July 2005 and the second in January 2006 - found Claimant did not meet the "B" or "C" criteria of the Listings, and was no more than moderately limited in a range of mental work-related functions. (Tr. 228, 232, 294, 298). Third, numerous medical reports document Claimant's retained mental functioning, ability to cooperate with her evaluators, maintain good eye contact, speak normally, maintain her orientation, and remain calm. (Tr. 222, 248, 269, 272-73, 279, 331-38). Finally, Claimant reported in August 2005, one month after being hospitalized for suicidal ideations, that she was looking for a job. (Tr. 259).

Despite the above support for the ALJ's ultimate conclusion and treatment of Ms. Wilson's and Ms. Sosa's reports, the Court cannot determine whether the ALJ's conclusion at step three of the sequential analysis is supported by substantial evidence because the Court is not

clear what weight the ALJ assigned to a portion Ms. Wilson's August 2006 report. The ALJ

clearly adopted Ms. Wilson's opinion in her August 2006 report that Claimant had only mild to

moderate limitations in the "B" criteria of the Listings. (Tr. 23, 320). The ALJ failed, however,

to mention the portion of Ms. Wilson's August 2006 report wherein Ms. Wilson opined Claimant

met the "C" criteria of Listings 12.04 and 12.06. (Tr. 321). Because the Court may not engage

in an independent assessment of the weight to be assigned to Ms. Wilson's opinion, see Craig,

76 F.3d at 589 [holding the Court may not re-weigh conflicting evidence or substitute its

judgment for that of the Commissioner], and because Ms. Wilson's opinion is relevant to step

three of the sequential analysis, the Court recommends the case be remanded. On remand, the

Court recommends the ALJ explicitly consider Ms. Wilson's opinion on the "C" criteria, and, if

needed, further consider Ms. Wilson's February 2006 report and Ms. Sosa's December 2005

report.

2.      <u>Whether the ALJ in the Hypothetical to the VE</u>.

Claimant argues the ALJ erred by failing to mention in the hypothetical to the vocational

expert, ["VE"], Claimant's limited ability to complete a regular workday and workweek.

Commissioner argues the ALJ posed a proper hypothetical to the ALJ.

During step five of the sequential analysis, the ALJ is responsible for reasonably setting

forth in the hypothetical to the VE all of a claimant's impairments. <u>Walker v. Bowen</u>, 889 F.2d

47, 50 (4th Cir. 1989); SSR 96-5p (1996). In other words, the hypothetical must "adequately

reflect" a person's impairments, <u>Johnson v. Barnhart</u>, 434 F.3d 650, 659 (4th Cir. 2005), and

should reflect a claimant's RFC. 20 C.F.R. § 404.1545; SSR 96-8p. However, the ALJ's

hypothetical need only include those limitations supported by the record. <u>Johnson</u>, 434 F.3d at

40

659.

The ALJ in the present case found Claimant retained the residual functional capacity to

perform:

> "light work, provided she never climbs ladders, ropes or scaffolds and avoids
> concentrated exposure to hazards and unprotected heights.  She can perform simple,
> routine tasks (not complex and/or detailed), but should have no greater than occasional
> interaction with supervisors and co-workers, and no public contact.  She must avoid fact-
> paced production quota-type work activity."

 (Tr. 22).  At the hearing, the ALJ posed asked the VE to consider an individual who had the

following mental limitations:

> "the need to do just simple routine type work, avoiding complex or detailed activity, and
> by simple I mean one and two-step type work; contact with coworkers and supervisors is
> only occasional; no work with the general public, more emphasis for her on working with
> things rather than people, and of course according to the doctor's a low stress work
> setting, no fast-paced production work activity."

(Tr. 381).  The VE responded there existed a significant number of jobs in the national and

regional economies that accommodated the hypothetical individual's limitations.  (Tr. 382).  The

VE was not asked to consider the hypothetical individual's need to be take rest breaks or be

absent from work due to psychological impairments.  Claimant alleges the ALJ erred by omitting

such a limitation from the hypothetical.  The Court, mindful of its role in reviewing the ALJ's

decision, declines to find the ALJ had a duty to include such a limitation in the hypothetical.  See

Craig, 76 F.3d at 589 [holding it is not the Court's role to re-weigh the evidence; but only to

decide whether the ALJ's decision is supported by substantial evidence and legally sound].  The

Court does find, however, the ALJ had a duty to, at a minimum, document his consideration of

Claimant's limited ability to maintain attendance at work and complete a regular workday and

workweek.  The Court so finds because that limitation is found repeatedly in the record (Tr. 222,

228, 232, 279, 289, 294, 312, 317, 370), such that the evidence falls within the "relevant evidence" the ALJ should have considered.  See 20 C.F.R. § 404.1545; Jordan v. Califano, 582 F.2d 1333, 1335 (4th Cir. 1987) [holding while the ALJ does not have to document consideration of all the evidence, he must document consideration of all relevant evidence].  The Court therefore recommends the case be remanded for further consideration of Claimant's RFC and the hypothetical to the VE, based on the evidence that Claimant appears limited in the her ability to maintain a regular workday and workweek.

### IV.  Recommendation

For the foregoing reasons, I recommend that:

1.      Claimant's Motion for Summary Judgment be **<u>DENIED</u>** and the case **<u>REMANDED</u>** because although the ALJ's decision appears supported by substantial evidence, the ALJ failed to demonstrate his consideration of 1) a portion of Ms. Wilson's August 2006 report, and 2) Claimant's limited ability to maintain a regular workday or workweek such that remand is necessary.

2.       Commissioner's Motion for Summary Judgment be **<u>DENIED</u>** for the same reasons set forth above.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days from the date of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.  A copy of such objections should be submitted to the District Court Judge of Record.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment

of this Court based upon such Report and Recommendation.

The Clerk is also directed to transmit copies of this Report and Recommendation to the plaintiff and counsel of record, as applicable.

DATE: August 15, 2008

/s/ James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE